UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:06-00010 |
| ) | Judge Echols |
| WILLIAM MATTHEW MANNING ) | |

## MEMORANDUM

Pending before the Court is Defendant's Motion to Suppress Evidence (Docket Entry No. 24)[1], which has been fully briefed by the parties. The Court held an evidentiary hearing on the Motion to Suppress Evidence on April 5, 2007 and on April 24, 2007.

## I. FACTS

During the course of the evidentiary hearing in this case, the Court heard from several witnesses. The testimony of the witnesses was often conflicting on key matters.

On August 6, 2006, Detective Sergeant Terry Dial ("Sgt. Dial") of the Maury County Sheriff's Department obtained a warrant for Defendant's arrest on a charge of felony evading arrest. The arrest warrant indicated that Defendant had been driving a white 1993 Nissan Sentra at the time he allegedly evaded arrest.

Prior to executing the warrant, Sgt. Dial heard from a Columbia police officer that Defendant had indicated he would "do harm" to anyone who tried to arrest him. That information came from the Columbia police officer's brother who was a methamphetamine user, who stated that Defendant also was a frequent methamphetamine user and was often high from ingesting the drug. Officers of the Maury County Sheriff's Department further believed that Defendant may have been involved in several recent burglaries in the area.

---

[1] Though titled as a Motion to Suppress Evidence, the Defendant is seeking to suppress evidence as well as statements he made to law enforcement officials. Accordingly, the Motion to Suppress Evidence will be construed as a Motion to Suppress both the evidence and statements at issue in this case.

1

On August 21, 2006, officers staked-out the residence located at 4358 Roy Thompson Road ("the Mannings' residence") in Mt. Juliet, Tennessee where Defendant was known to often reside with his parents, William and Brenda Manning. Though the officers surveilled the residence for approximately one and one-half hours, they did not see the Defendant or observe any vehicles at the residence.

The following day, August 22, 2006, at approximately 12:00 p.m., Sgt. Dial and Detective Andy Jackson ("Det. Jackson") went to the Mannings' residence to execute the arrest warrant.[2] Accompanying them in a separate vehicle was Detective Cheek ("Det. Cheek").

The Mannings' residence is located on Roy Thompson Road but is accessed by a long driveway which curves over a small bridge and continues toward the left side of the residence. When the officers arrived on the scene they noticed a white 1993 Nissan Sentra fitting the description of the automobile that Defendant had been driving parked to the left of the driveway approximately 30 to 40 yards from the house. The front of the Nissan was pointed towards the back of the residence which faced Roy Thompson Road. The Nissan was visible from the street and the driveway was not gated or otherwise secured.

The officers pulled off of Roy Thompson Road and parked their vehicles approximately 30-40 yards behind the white Nissan. Upon exiting their vehicles, the detectives walked along the driveway towards the house. Sgt. Dial and Det. Cheek crossed the driveway about ten feet behind the Nissan while Det. Jackson stopped at the vehicle and remained there while the other two officers approached the house.

Sgt. Dial first went to the double front doors on the left side of the residence because it looked like it was used as an entrance and Det. Cheek positioned himself at the back side of the house. The officers could hear a television set playing inside.

---

[2]Officers had been informed by Defendant's daughter's grandmother that Defendant was at the house that day.

2

Sgt. Dial knocked on the front door four or five times, waited for a moment, and then again knocked four or five times. Upon receiving no response, Sgt. Dial walked to the back of the house and repeated the same knocking pattern on the back door. Again there was no response from inside.

As Sgt. Dial began walking back towards the front of the house, he heard Det. Jackson yell "we have some guns here in the car." Sgt. Dial walked back to the Nissan where Det. Jackson was waiting beside the vehicle with both doors open. While the evidence is somewhat conflicting, the doors were open, both the driver's and front passenger's seats had been pushed forward, and the back of the driver's seat was pushed forward towards the steering wheel.

Det. Jackson told Sgt. Dial he saw guns in the Nissan. He stated he first saw the stock of a sawed-off shotgun on the back floorboard resting on the center hump. Det. Jackson next showed him the smaller sawed-off shotgun which he had discovered under the rubber floor mat on the driver's side, along with a hunting knife. The rubber mat had been turned up toward the front of the car, exposing the bottom of the mat and the small sawed-off shotgun and knife resting on the front floorboard carpet.

Det. Jackson testified that when Sgt. Dial and Det. Cheek went to the house, he remained at the Nissan to secure the area and to clear the path and vehicles on the way to the house. Initially, he looked through the rear window on the driver's side of the vehicle and then looked through the driver's side window. Det. Jackson testified that he noticed that the front passenger floor mat had a bulge in it, as if something were lying underneath the mat. Det. Jackson claims he then walked to the passenger side of the front window and looked into the vehicle. From that vantage point, Det. Jackson claims that he saw the barrel of a weapon under the floor mat. He then went back to the left rear of the vehicle for a better view of the back seat area. When he looked in the window, he saw the stock of what he believed to be a sawed-off shotgun lying across the transmission hump in the rear compartment of the vehicle. He then opened the left door to confirm that he had in fact seen the two weapons in the vehicle.

3

No pictures were taken of the vehicle or its contents in the condition the vehicle was in at the time Det. Jackson claims he made the discovery of the weapons. Instead pictures were taken with the front passenger door open, the front rubber floor mat pulled back to expose the small sawed-off shotgun on the floorboard underneath the mat, the front seats pushed forward to expose more area on the back floorboard, and the back of the driver's seat was pushed up towards the steering wheel to more clearly see the backseat area.

After discovery of the weapons, Sgt. Dial called the state court judge who had issued the arrest warrant. The Magistrate Judge told the officers to secure the weapons. Sgt. Dial then called his supervisory Lieutenant to advise him of the situation. The Lieutenant told Sgt. Dial he was calling the SWAT team and to wait there for them.

An hour to an hour and one-half elapsed between the officers' initial arrival and the arrival of the SWAT team. The SWAT team staged on the side of the creek closest to Roy Thompson Road and formulated a plan to enter the house and arrest the Defendant. Meanwhile, Det. Jackson, who was also a hostage negotiator, got into his car, drove to the front yard of the house and began to try to coax the Defendant out of the house on the car's loud speaker. By that time, the SWAT team had arrived. He also called the Mannings' home telephone number a number of times in an effort to talk to the Defendant and left several messages on the answering machine. Finally, Defendant answered the phone. Det. Jackson explained to him that he had a warrant for his arrest, that the SWAT team was on the scene, and that Defendant should come out of the house with his hands raised. Defendant fully complied with Det. Jackson's instructions and walked out of the side double glass door entrance to the house.

Upon exiting the house from the side door, Defendant was ordered by the SWAT team to lie on the ground. He obeyed and was handcuffed. While Defendant was still lying on the ground, Det. Jackson read him his *Miranda* rights. After Defendant was arrested, some of the officers went into the house to search. No barricades or evidence of resistance were found.

4

Defendant was then placed in the back of a police car at approximately 3:30 p.m. and, after approximately thirty minutes, was transported to the Maury County Sheriff's Department.

At the Sheriff's Department, Defendant was again read his *Miranda* rights, this time by Det. Cheek. He signed an "Admonition and Waiver" of rights form at 5:30 p.m. and wrote out several statements in which he admitted that the shotguns found in the Nissan were his.

Defendant is an admitted methamphetamine user. He has been addicted to methamphetamine since he was 17 or 18 years old. He graduated from high school and was twenty-three years old at the time of his arrest. He claims that he arrived home at his parent's house at approximately 10:00 p.m. on August 21, 2006.[3] He claims he had been high on methamphetamine for about five days when he got home and proceeded directly upstairs to bed and went to sleep. He slept soundly through the night and did not awaken until the following afternoon when he heard the telephone ringing. Upon being apprised that a SWAT team was outside, he set the phone down and voluntarily went outside with his hands in the air.

Defendant claims that after his arrest, he was not read his rights until he arrived at the station. As for the Waiver Form, he claims he did not understand it and that he was "out of it" and did not realize he had even been placed in jail until two or three days later.

With regard to the Nissan Sentra, Defendant testified that it was owned by his father but he was allowed to drive it. When he drove the car, he always kept the front seats pushed back as far as possible and reclined the front seat backs because the Nissan Sentra is a small car and Defendant is 6' 1" tall and has long legs. On the weekend before his arrest, Defendant lost the privilege of driving

---

[3]The testimony regarding Defendant's arrival at home is conflicting. On direct examination, Defendant indicated he returned home at approximately 10:00 on the night before his arrest. On cross-examination, he indicated that he got home at 10 a.m. on August 22, 2006. Defendant's mother testified that she believed Defendant returned home on the evening of August 21, 2006, and looked in on him the following morning as she was leaving for work. The Court finds this to be the preponderance of the evidence on this issue.

5

the Nissan when his mother found a gun in the car. He told her it belonged to a friend and that he would get rid of it, but she told him that he could not drive the car again until he got rid of the gun.

Defendant's mother, Brenda Manning, confirmed that Defendant was prohibited from driving the car when she found a weapon in it on the Saturday or Sunday before his arrest on Tuesday. She testified that she washes all three of the family cars each weekend. On the weekend in question, she said she hand-washed the Nissan but observed no weapons while doing so. She claims that she then proceeded to vacuum the vehicle and in doing so discovered a gun on the back floorboard under a shirt. Brenda Manning's testimony about the discovery of the gun was inconsistent. At one point she indicated that she vacuumed the front floorboard of the Nissan and then found the gun after she moved the seat forward to vacuum the back of the vehicle. At another point she appeared to be testifying that she began by vacuuming the back floorboard first and found the gun under a shirt and then proceeded to vacuum the front, but there was no gun under the front floorboard. Regardless, the pictures introduced at the hearing make clear that the front passenger floorboard where the small short shotgun and knife were found was sprinkled with dead grass and had not recently been vacuumed. Furthermore, the photos of the back floorboard showed an old discarded drink cup which ordinarily would have been removed if the area was recently vacuumed.

Based upon the preponderance of the evidence, and weighing the credibility of the witnesses, the Court finds as a fact that the shotguns were not in plain view, but rather were located out-of-sight under the front passenger floor mat and behind the front seats which were pushed back and reclined. While it is difficult to determine which of the witnesses were being entirely forthright in their testimony, several factors lead to this Court's finding on this critical issue.

First, Det. Jackson claims he saw the shotguns in plain view and that he knew by their length that they were illegal sawed-off weapons. More specifically, Det. Jackson alleges his job was to clear the path and vehicles on the way to the house. He said when he stopped at the Nissan parked on the side of the driveway, he started on the left back side of the vehicle and began looking inside

6

as he walked forward. As he got to the driver's window, he could see that the passenger's floor mat was raised in the middle as if something was beneath it. The bulge under the rubber mat caused an open space on the far side of the mat, so he walked around the front of the vehicle to the right side to get a better view. When he looked through the right front windshield he saw the barrel of a shotgun in the open space caused by the bulge. Det. Jackson states he then proceeded to inspect the vehicle more closely. As he crossed the back of the car and peered into the back left window, he saw the stock of a gun pointing to the right resting on the center transmission hump. Because of the limited space between the hump and the right side of the vehicle, he knew the gun was a sawed-off shotgun.

Nevertheless, Det. Jackson made no effort to preserve the crime scene at that point, and took no pictures. Instead, with nobody else around, he opened the left door, lifted the front floor mat from the bottom and lifted it forward to fully expose a short sawed-off shotgun and knife. Next, he pushed the back of the driver's seat forward so the stock of the sawed-off shotgun on the back floorboard could be clearly seen.

Second, the exhibits introduced at the hearing tend to belie Det. Jackson's testimony. In particular, Det. Jackson claims that he saw the barrel of the shotgun sticking out from under the front floor mat. However, Government's Exhibit 3A shows the short sawed-off shotgun on the floorboard with the rubber floor mat rolled forward from the bottom. It is clear from that picture, given the impression made by the floor mat on the carpet, that if the floor mat were pulled back down it would completely cover the small shotgun and one could not possibly determine what was under the floor mat, let alone know that it was an illegal weapon. A close inspection of the photograph shows that the lines made in the carpet by the bottom of the floor mat extend well-beyond each end of the

7

shotgun, meaning that the floor mat would have covered the entirety of the sawed-off shotgun[4] and only a small bulge would have been visible.

Further, the stock of the sawed-off shotgun on the back floorboard behind the front passenger seat is depicted in Government's Exhibit 3B. This photo reveals that the stock would not be visible with the backs of the front seats tilted back because there is very little room between the back of the front seats and the back seat. One cannot view the back floorboards from the outside with the seats in such a position. That same exhibit shows the front passenger seat back reclined in the position it was found when the shotguns were discovered. The front seat back totally obscures the receiver and the barrel of the shotgun. If the front driver's seat was reclined as Defendant testified was his preferred driving position because of the lack of leg room, the gun would not be visible standing outside and looking through the window because there were only a few inches between the two front seat backs. It is extremely doubtful that one could identify anything on the back floorboard as a sawed-off shotgun by merely looking in through the windows.

Third, the affidavit submitted by Special Agent Clara S. Himel of the Bureau of Alcohol, Tobacco and Firearms in support of the federal Criminal Complaint in this case is entirely inconsistent on pertinent points with the testimony presented at the hearing by the detectives on the scene at the time of the search of the Nissan.[5] That affidavit recounts a conversation S.A. Himel had with Sgt. Dial after Defendant's arrest. After describing the alleged threats made by Defendant to do harm to police officers, S.A. Himel wrote:

> In light of that information, Maury County Sheriff's Department Deputies used caution in approaching Manning's house to execute the arrest warrants [sic] and conducted surveillance of the location. At the residence, deputies knocked and

---

[4] Actually, this sawed-off shotgun is not much larger than a pistol inasmuch as most of the barrel has been sawed-off and the stock has been sawed-off almost to the back of the trigger guard.

[5] The Court does not believe that S.A. Himel engaged in any chicanery. Instead, the Court believes that she was merely parroting back what Sgt. Dial had told her when she went to the Maury County Sheriff's Department on unrelated business several weeks after the incident.

announced their presence. Manning, however, refused to answer the door and barricaded himself inside. As a result, deputies then backed away from the residence.

As the deputies backed away, Detective Andy Jackson observed what he described as a sawed-off shotgun in plain view on the back seat of the vehicle parked in front of the Manning residence. Detective Dial then telephoned the judge who issued the arrest warrant and advised him of the situation. In addition, Detective Dial informed the judge of the sawed-off shotgun observed inside the vehicle. Judge Bailey advised the deputies to secure the area and to secure the shotgun. As deputies retrieved the shotgun, identified as a Winchester Model 120, 20-gauge, shotgun, the deputies observed a second sawed-off shotgun located on the front floorboard of the vehicle. The second firearm is properly described as a weapon made from an Iver Johnson and Arms, Model Champion, 20-gauge shotgun.

Due to the nature of the situation, the Maury County Sheriff Department's S.W.A.T. Team was dispatched to the location. After more than two hours, Detective Andy Jackson was able to persuade Manning to surrender to deputies.

(Def. Ex. 6).

Leaving aside that there is absolutely no evidence to support the statement that Defendant "barricaded" himself inside the residence,[6] or that it took two hours to persuade him to come out, the affidavit directly contradicts the testimony presented at the hearing as to how the guns were discovered. The affidavit says that the first shotgun was seen in plain view on the back seat. However, Det. Jackson testified he saw the barrel of a shotgun under the front floor mat from the driver's side of the vehicle, and thereafter, he saw the second shotgun on the back floorboard behind the passenger's seat, not on the back seat. In addition, the affidavit states that the second shotgun was found after Sgt. Dial called the state court judge, whereas, Det. Jackson testified that he found both shotguns before he called the state court judge. Sgt. Dial also testified he called the state court judge after both shotguns were found.

The Court also finds as a fact that Defendant was advised of his *Miranda* rights after he came out of the house and was placed under arrest. Defendant testified he was awakened by the ringing

---

[6]After Defendant came out of the house and was arrested, several officers, including Det. Dial, went into the house to search. There is no evidence that Defendant was asked or gave his consent. The television was on in the house and Defendant had been asleep in an upstairs bedroom. There was no proof of any barricade inside the house.

9

of the telephone. Detective Jackson told him he was with the Maury County Sheriff's Department, the SWAT team was outside, and he needed to come out of the house. Defendant stated he immediately put the telephone down and walked outside the side door with his hands in the air where the officers were waiting. He was ordered to get on the ground and obeyed. He was told to put his hands behind him and he complied. Det. Jackson testified that Defendant looked like he had just been awakened when he came out of the house, but he was cooperative, coherent, and "real talkative." Det. Jackson read his *Miranda* rights to the Defendant when he first came out of the house and was on the ground. Afterwards, Defendant was handcuffed, helped to his feet by the deputies, put into a sheriff's patrol car, and after about thirty minutes taken to jail.

The Court further finds that Defendant understood his *Miranda* rights. While Defendant claims he was not read his rights at the residence, the Court credits the testimony of the officers that Defendant was read his rights prior to transportation to the jail and again by Det. Cheek after he arrived at the Sheriff's Department. He then signed a waiver form in the presence of Det. Cheek and Sgt. Dial and made statements detailing his involvement with the guns in question. At the time the statements were written, Defendant was not subjected to threats, coercion or a show of force. In fact, Det. Jackson said he talked to Defendant about members of his family whom he knew.

Defendant also claims that he had been on a five-day high and did not understand what was happening or that he was even in jail until days later. The Court finds that Defendant's testimony in this regard is not credible, and it contradicts other statements made by the Defendant on the day of his arrest. While grammatically incorrect in various places, Defendant's statements are lucid and clearly suggest that Defendant was fully aware of what was going on at the time they were made.

10

## II. APPLICATION OF LAW

Based upon the discovery of the weapons, Defendant was charged in a one-count Indictment with the knowing possession of two short-barrel shotguns as defined by 26 U.S.C. § 5845(a), that were not registered in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d) and 5871. Defendant seeks to suppress the weapons, as well as the statements he made after his arrest.

### A. Suppression of Evidence

Preliminarily, the parties raise arguments as to whether the Nissan Sentra in this case was within the curtilage of the home. The Government claims that the Nissan was not within the curtilage. The Defendant claims that the Nissan was within the curtilage and therefore entitled to the same protection as the home under the Fourth Amendment, meaning police had no right to be next to the vehicle and consequently no right to look inside.

An individual has a reasonable expectation of privacy in the interior of his home and its curtilage. Oliver v. United States, 466 U.S. 170, 180 (1984). "[C]urtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life." Id. Thus, "[t]he protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." California v. Ciraolo, 476 U.S. 207, 212-13 (1986).

Four factors are used in determining whether an area around a home is considered curtilage. These include (1) the proximity of the area to the home; (2) whether the area is included within an enclosure surrounding the house; (3) the nature of the uses to which the area is put and whether it is used for the intimate activities of the home; and (4) the steps taken to protect the area from observation. United States v. Dunn, 480 U.S. 294, 301 (1987).

In this case, the four factors indicate that the Nissan was not within the curtilage of the home. It was parked approximately 30-40 yards from the house and out in the open off the side of a long

11

driveway leading to the house. No steps were taken to shield the area from observation and, in fact, the Nissan was visible from the road. See, United States v. Lakoskey, 425 F.3d 965, 973 (8th Cir. 2006)(expectation of privacy cannot be extended to driveway, walkway, or front door area); United States v. Hatfield, 333 F.3d 1189, 1194 (10th Cir. 2003)("an owner does not have a reasonable expectation of privacy and . . . police observations made from the driveway do not constitute a search); United States v. Reyes, 283 F.3d 446, 465 (2d Cir. 2002) ("driveways that are readily accessible to visitors are not entitled to the same Fourth Amendment protections as are the interiors of defendants' houses"); United States v. Smith, 783 F.2d 648, 651 (6th Cir. 1986)(no expectation of privacy in driveway which was not obstructed and where there was no effort made to screen off or enclose area). Because the Nissan was not within the curtilage of the home and further because the officers were executing a valid arrest warrant, they had a right to walk by or stop next to the vehicle and look inside. However, they had no right to simply open the doors to the vehicle and search inside.

In a footnote to its brief, the Government also claims in passing that the search of the Defendant's vehicle was permissible under the automobile exception to the warrant requirement. (Docket Entry No. 33 at 7 n. 3). The Court rejects this argument. "The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." Coolidge v. New Hampshire, 403 U.S. 443, 468 (1971). In Coolidge, the Supreme Court indicated that the automobile exception to the warrant requirement extended only to circumstances in which "it was not practicable to secure a warrant," id., because the automobile is potentially mobile. For the exception to apply, police officers must have probable cause to believe the vehicle contains incriminating evidence or contraband. United States v. Cope, 312 F.3d 757, 775 (6th Cir. 2002); United States v. Hill, 193 F.3d 258, 273 (6th Cir. 1999). Here, the Court finds that at the time the vehicle was searched officers did not have probable cause to believe the Nissan contained contraband or incriminating evidence.

12

The Government in this case also seeks to justify the seizure of the shotguns from the Nissan based upon the plain view doctrine. The Supreme Court has explained that "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity." Payton v. New York, 445 U.S. 573, 587 (1980). "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment – or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375-76 (1993).

"The plain view exception to the warrant requirement applies when (1) the officer did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed, (2) the item is in plain view, and (3) the incriminating character of the evidence is immediately apparent.'" United States v. Calloway, 116 F.3d 1129, 1133 (6th Cir. 1997). Here, the officers did not violate the Fourth Amendment by being next to and looking into the vehicle since the vehicle was not within the curtilage and the officers had a warrant for Defendant's arrest. However, this Court has found as a matter of fact that neither weapon was in plain view and therefore their incriminating nature could not have been apparent. Accordingly, Defendant's Motion to Suppress Evidence will be granted and the shotguns seized on August 22, 2006 will not be admitted at trial.

### B. Motion to Suppress Statements

Defendant seeks to suppress the oral and written statements he made after he was taken to the Sheriff's Department. After his arrival, Defendant was read his *Miranda* rights and asked to sign a waiver of *Miranda* rights form. Immediately afterwards, he was questioned about his ownership of the sawed-off shotguns found in the Nissan Sentra.. When confronted with the illegally obtained evidence, Defendant confessed the shotguns belonged to him and signed a written statement to that effect.

13

A *Miranda* waiver will be upheld only if, under the totality of the circumstances, the waiver was voluntary, knowing and intelligent. "When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999). A statement is coerced or involuntary if the police activity was coercive, the coercion in question was sufficient to overcome the defendant's will, and the alleged misconduct was a "crucial motivating factor in the defendant's decision to offer the statement." Id.

In determining whether a Defendant's confession is voluntary, the Court looks at the "totality of the circumstances surrounding the confession" including factors such as "the age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep." McCalvin v. Yukins, 444 F.3d 713, 719 (6th Cir. 2006).

In this case, the Court has found that Defendant was read his *Miranda* rights twice and that he subsequently signed a waiver of *Miranda* rights form before he made the incriminating statements at issue. However, "giving a defendant Miranda warnings is insufficient alone to break the causal chain between an illegal search and a subsequent confession." United States v. Paradis, 351 F.3d 21, 34 (1st Cir. 2003). This is because the giving of Miranda warnings "cannot assure in every case that the Fourth Amendment has not been unduly exploited." Brown v. Illinois, 422 U.S. 590, 603 (1975). Instead, the giving of *Miranda* warnings can be an indication that any statement made thereafter is a product of one's free will. Oregon v. Elstad, 470 U.S. 298, 310-311 (1985).

Although Defendant was twice-read his *Miranda* warnings, the totality of the circumstances show that the exploitation of the fruits of the illegal search of the Nissan was so substantial that it contaminated Defendant's voluntary confession, and it cannot be resuscitated by the reading and waiver of his *Miranda* right. It is highly unlikely that Defendant would have confessed that he

14

possessed illegally sawed-off shotguns if the officers had not discovered them in his father's car which he had driven in a few days before. The sawed-off shotguns were tainted evidence from an illegal search which were used to break Defendant's independent free will and to destroy the voluntary nature of his confession.

Apart from the giving of the *Miranda* warnings, there was no "intervening independent act of free will sufficient to purse the primary taint of the unlawful invasion." United States v. Shaw, 464 F.3d 615, 627 (6th Cir. 2006). After the shotguns were unlawfully discovered and Defendant had been arrested, he was taken to the jail and promptly questioned about the shotguns while sitting in a room with arresting officers. There was no time for real reflection or thought. When presented with the officer's discovery of the guns in his father's car used by Defendant a few days earlier, Defendant confessed that they belonged to him. This confession was obtained by the use of illegally obtained evidence. It is fruit from a poisonous tree. "Confronted with incriminating physical evidence – the firearm – after the illegal search," Defendant "had an incentive to immediately confess to his possession of the firearm." United States v. Baldwin, 114 Fed. Appx. 675, 683 (6th Cir. 2004)(upholding suppression of statement made immediately after illegal search and the giving of Miranda warning, as well as statement made two months later after Miranda rights were given anew where defendant remained in jail during that period); compare, Paradis, 351 F.3d at 34 (seven days between unlawful seizure of gun and statement sufficient to break causal chain between illegal search and confession). Based upon all of the evidence surrounding Defendant's questioning, the Court finds the Fourth Amendment was unduly exploited by the wrongful seizure of the shotguns and there was no intervening act of free will sufficient to break in the causal link between the illegal search and subsequent statements made by Defendant to the interrogating officers. Therefore, the Court finds said statements were not made voluntarily. Accordingly, the statements Defendant made to the police officers after his arrest on August 22, 2006 will also be suppressed**.**

15

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress Evidence (Docket Entry No. 24), construed as a Motion to Suppress Evidence and Statements, will be granted.

An appropriate Order will be entered.

_Robert L. Echols_
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE